### In re WIBACK et al.

#### (District Court, D. Massachusetts. August 13, 1917.)

#### No. 18311.

BANKRUPTCY ⬤➙414(3)—PROCEEDINGS FOR/ DISCHARGE—WEIGHT AND SUFFI-
CIENCY OF EVIDENCE.

When bankrupts first became embarrassed financially, an attachment was placed on their goods by a friendly creditor, under which business went on as usual, and a common-law assignment was made to such creditor, which, however, was never completed. Afterwards a hostile attachment was placed on the store. About this time witnesses noticed a great depletion in the stock, and a storage cellar was broken into. Though the bankrupts knew of this, and were active around the store, they made no complaint to the police, and took no steps to see whether goods had been stolen, or who had committed the break. The books of the firm showed a shortage in cash or merchandise of from $4,300 to $6,600. *Held,* that the facts showed that the bankrupts removed and concealed property belonging to the estate, justifying the denial of their applications for discharge.

In Bankruptcy. In the matter of Felix Wiback and others, bankrupts. On applications for a discharge. Applications refused.

Taylor & Taylor, of Worcester, Mass., for bankrupts.
Simon G. Friedman, of Worcester, Mass., for creditors.

MORTON, District Judge. The ground of objection to discharge, now principally relied upon, is that the bankrupts knowingly and intentionally concealed and removed assets belonging to the estate.

The bankrupts carried on a retail grocery and provision store, and in connection with it a bottling establishment and a steamship ticket agency. It was a business of substantial size, the gross income having apparently been upwards of $60,000 a year, the greater part of

⬤➙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which came from the groceries and provisions. Beneath the shop was a cellar, which was used for storage purposes and for the bottling business. Access to it was through the store; there were doors leading into it from other parts of the building, but they were permanently fastened.

The bankrupts' serious financial difficulties appear to have begun on May 3d, when an attachment was placed on the goods in the store, followed a few days later by another attachment in favor of Lundborg, who was a friendly creditor. Under his attachment, the prior one having been discharged, the bankrupts' bookkeeper, Honkenen, was appointed keeper, and business went on much as usual. Considerable amounts of money were received by the bookkeeper from cash sales and from payments on outstanding accounts receivable. Substantial sums were handed to Wiback for the purpose of paying running expenses and buying new stock. A common-law assignment was made by the bankrupts to Lundborg; but it was not completed according to the requirements of Massachusetts law, and nothing was done under it. On May 15th another attachment was placed on the store, and the bookkeeper was superseded as keeper by one Stockwell, who continued to act until the receiver in bankruptcy took possession on May 27th.

At the time when the attachments were first placed upon the store, it seems clear that there was a large and complete stock of goods in it and the cellar. Estimates as to the amount of stock vary; Wiback testifies that it was worth over $2,000; the objecting creditor, on incomplete data, figures the amount as over $4,300; Honkenen's estimate is rather indefinite, but falls between the two.

The operation of the store was continued under all the attachments, until bankruptcy proceedings were instituted; and goods were purchased and sold in the ordinary course of business. After Stockwell became keeper, team deliveries were suspended, and the purchases were more restricted.

The accounts from March 1st to May 16th are produced. They are apparently accurate, and appear substantially to balance. They show no depletion of stock. According to them, the stock should have increased in value in that interval about $2,800. The receiver in bankruptcy found only $500 or $600 worth of goods in the store and cellar. On the figures of the objecting creditor, about $6,600 in goods or cash is unaccounted for. Accepting Wiback's estimate of the stock on hand on March 1st ($2,000), and the expert bookkeeper's statement of the merchandise account after that date, the accuracy of which has not been seriously questioned, about $4,300 worth of goods disappeared.

There is testimony from several witnesses that a great depletion of stock was noticed during the last two weeks in May; i. e., after the common-law assignment to Lundberg had failed, and a hostile attachment had been placed on the store, and it had become evident to the applicants that they must go through bankruptcy. Honkenen testifies that on May 1st the store had its full usual stock, and that "there was quite a remarkable depreciation" of it between May 16th and the bankruptcy on May 25th.

While the attachments were in force, Wiback said that the bankrupts expected Lundberg to buy the property, and that they were going to continue the business. After May 16th the storage cellar was broken into. That goods were taken is not explicitly stated in the evidence; but, of course, they were. The doors were not broken down for exercise or amusement. This phase of the case is left somewhat indefinite on account of Stockwell's death before testifying. When the attachments were made, and for some time after that, the cellar contained a substantial amount of stock; there was little or nothing in it when the receiver took possession. The break was called to the attention of the bankrupts; but, according to their own testimony, neither one of them made any complaint to the police about it, or took any steps to see whether goods had been stolen, or made any inquiries or investigations to determine who had committed the break.

There can be no doubt that, between the first attachment and the bankruptcy, a large amount, either of goods or of money received from the sale of goods, disappeared and is unaccounted for. The bankrupts were active around the store all this time. If they were honest, they would naturally be the first to notice such an occurrence and to call attention to it. They never did so. They testify, in effect, that they do not know what became of the goods, if any were taken; but they make no suggestion as to how the loss occurred. In my opinion, the bankrupts knew that the stock was disappearing and kept silent about it. Their conduct with reference to the break in the cellar strongly suggests collusion therein. Why did they display no interest in such an occurrence? Why did they not have the matter brought to the attention of the police? Why did they not endeavor to ascertain whether anything had been stolen? Their counsel suggests, because the store was under attachment and the keeper was responsible; but the bankrupts gave no such reason, and I do not regard the explanation as adequate, if they had offered it.

There is, it seems to me, but one reasonable explanation of the plain facts and of the bankrupts' conduct, viz. that the stock or its proceeds was being taken by them, or with their knowledge and approval.

The learned referee's findings on the fifth specification are set aside. I find that the bankrupts did remove and conceal property belonging to their estate.

Applications for discharge refused.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes